**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:12-CR-175-PPS |
| | ) | |
| DANIELA TARTAREANU, and | ) | |
| ADRIAN TARTAREANU, | ) | |
| | ) | |
| Defendant-Petitioners. | ) | |

**OPINION AND ORDER**

Nearly six years after a jury returned a guilty verdict on all counts, this case has returned to me in the form of a habeas corpus petition from husband and wife co-defendants Adrian and Daniela Tartareanu. [DE 420.] The couple was found guilty of one count of conspiracy to commit wire fraud and 16 counts of wire fraud. While both of them have since completed their terms of imprisonment, they are seeking to have their convictions set aside pursuant to 28 U.S.C. § 2255 because they say their counsel's performance was so ineffective (at both the trial and appellate level) that it violated their constitutional right to a fair trial. An evidentiary hearing was held on August 17, 2020 where the Tartareanus' trial counsel, Kevin Milner, testified. [DE 475.] After a review of the briefing, evidence, and testimony elicited at the evidentiary hearing, I find that the Tartareanus' claims of ineffective assistance of counsel are without merit. As such, their petition is DENIED.

## Background

Petitioners Daniela and Adrian Tartareanu[1], along with their co-defendant Minos Litos, ran a house-flipping business prior to the "Great Recession" and financial crisis of 2008 and 2009. They were convicted of running that company not as an honest business, but as a scheme to defraud both banks and home buyers. While the fraud was more complicated and the evidence at trial even more detailed, the overall gist of the case was as follows.

In 2005, Adrian met Minas Litos while playing in a recreational soccer league. Adrian had been a professional soccer player in Romania before he and his wife immigrated to the United States. Adrian and Litos became acquainted and eventually decided to go into business together. That company was called Red Brick Investment Properties. The idea was to purchase homes in Gary, Indiana, rehab them with cosmetic updates, and then sell them for a profit. Litos had been successful in other business ventures and provided the capital. Adrian's primary contribution was his skill and labor as a contractor. Daniela, who was a licensed real estate agent, worked on the administrative side of things and ran the office. Adrian and Litos were the owners though, with Adrian having a 40% stake and Litos owning 60% of Red Brick.

The company billed itself as an investment opportunity to would-be homeowners. In order to learn the business, Adrian, Daniela, and Litos all attended a

---

[1] Because the two petitioners share a last name, I'll use their first names throughout to refer to them individually but generally use last names to refer to witnesses and other individuals, including their co-defendant Litos.

conference put on by a company called Home Vesters who explained how people could buy rundown houses, make cosmetic changes to them, and then sell them at a profit to individuals as an investment—with other people living in the home and paying rent to cover the mortgage and other expenses. The defendants took what they learned from Home Vestors and made it into a scheme to defraud.

As part of this plan, Red Brick sought out individuals who had good credit scores but not necessarily many assets or significant incomes. The company employed "recruiters" who worked to find "investors." They sold would-be buyers on the idea of investing by telling them they could buy homes that already had renters living in them. Others were told Red Brick would help them find renters. Individuals were told they could purchase houses with no money down and that they would even receive cash back at closing. The monthly mortgage payments would be taken care of because there were renters paying rent. As perhaps most credulous people would suspect, this was an offer too good to be true.

The scheme involved sucking in investors on the notion that they would turn a quick risk-free profit. But to accomplish this, the defendants needed lenders willing to finance the purchases. The money had to come from somewhere and the buyers certainly did not have it. The schemers got these lenders to go along by making the would-be investors appear more credit worthy than in fact they were. In other words, they lied on the loan applications. The scheme was designed to defraud banks—who candidly didn't exercise much diligence in reviewing the loan applications—into lending mortgages. There were 45 fraudulent home transactions charged in the

indictment. Not to simplify things too much, but the sum and substance of the scheme was that the buyers ended up with a lousy investment, the banks had worthless loans and the defendants made a lot of money.

In most cases, in order to secure a mortgage on a home a buyer/borrower needs to put up some of their own money. This is the down payment. Banks use its existence, along with the income and assets of the buyer or borrower to be sure there's a likelihood the borrower can repay the loan. Banks want to see buyers with skin in the game. But of the 45 home sales charged in the indictment, the buyers in those transactions all testified that they did not use any of their own money for a down payment.

So how did it the down payments get made? Red Brick gave the money to the borrower/buyer to use to buy the home from Red Brick. Sometimes that occurred directly, but more often, there were a few transactions prior to putting the money in borrowers' bank accounts to better obscure the source of the funds. The Government presented specific evidence at trial (Trial Ex. 187[2]) showing how money passed through checks and wires from the defendants to buyers. Generally, the first step involved a check being written from Litos's personal account, his business account from a company called Apella, the Tartareanus' account from a company called Adrosib, or from Red Brick itself. Regardless of the original source, the money would then be given

---

[2] References to factual exhibits throughout this opinion will either be to the Trial Exhibits from this case or to exhibits attached to the Tartareanus' petition which are available at Docket Entries 422-425, or the exhibits to the Government's response found at Docket Entry 462.

to a third party prior to ending up with the buyer. The scheme used numerous different third parties, including entities known as K&L Consultants, Love Feast Church, and Red Eye Property Investors. The most used one, however, was the "Coalition for Concern," an entity that was on its face something of a do-gooder organization helping would-be homebuyers with grant money to purchase homes. But Red Brick used it to try and hide the fact it was secretly on both sides of these real estate transactions. The Coalition for Concern was run by a man named Jerry Haymon (who also ran the aforementioned K&L Consultants) and he charged Red Brick $1,000 per transaction as a fee to move money from Red Brick or Litos to the buyers, and in the process conceal it as a "grant." These third parties would then write out a check in nearly an identical amount written out to cash or to the buyer/borrower as a "remitter." Then that was used for the down payment.

And why is that fraudulent? Because none of it was disclosed when it needed to be. For all home sales during the relevant time period, there was something called a HUD-1 form or settlement statement.[3] This is a form that is reviewed by the lender and title company and which is supposed to list all charges and credits to the buyer and to the seller as part of the transaction. There's a specific line item dealing with down payments as an amount paid by the borrower. In all 45 transactions, the down payments were listed as coming from the buyer/borrower, with no mention

---

[3] For mortgages and home sales after October 3, 2015, the HUD-1 has been replaced by something called a Closing Disclosure. *See* Consumer Financial Protection Bureau "What is a HUD-1 Settlement Statement?" https://www.consumerfinance.gov/ask-cfpb/what-is-a-hud-1-settlement-statement-en-178/ (accessed September 15, 2020).

whatsoever of the fact that the amounts had come via a circuitous route from Red Brick, the seller. Daniela signed these HUD-1s, stating that they were "true and accurate statement[s about] all receipts and disbursements made on my account or by me in this transaction." By doing this, Red Brick got the banks to lend money to the homebuyer—money that then went directly to Red Brick.

Of the 45 home sales charged in the indictment, 32 loans involved Bank of America. All those loans were processed by a Bank of America employee named Stephanie Riggs. She was not called to testify at trial by either side. But as discussed later in this opinion, a large part of the argument in this petition involves Riggs and her actions. While we'll never know Riggs's exact testimony, we do know she processed a little more than 2/3 of the loans at issue in this case (the other 13 were just as fraudulent but had nothing to do with her). We also know that in 2008, while the Red Brick scheme was still operating, Bank of America fired Riggs after a "loss of trust and confidence" it came to after investigating loans she approved. But Bank of America's investigation found no "conclusive evidence" that Riggs was involved in any "dishonest act or falsification of any bank records." [Trial Ex. 3; *see also* Ex. F.] We also know she told the FBI that she did not know Red Brick was paying the down payments and that any such arrangement would have needed to be disclosed.

Another person involved in the transactions who did not testify at trial was Rick Zunica. He owned a title company called Northwest Indiana Title Company that participated in the vast majority the sales (41 of 45) included in the indictment. Like Riggs, he plays a central role in the Tartareanus' petition. In addition to owning

Northwest Indiana Title Insurance and working as a title agent on almost every transaction in question, Zunica was also a lawyer. He was even Red Brick's lawyer at one point, representing it in some real estate disputes unrelated to the transactions at issue in this case. That information didn't come out at trial because Zunica didn't testify, nor did Daniela or Adrian. But at the same time, there is no evidence Zunica was working as Red Brick's or the Tartareanus' attorney on any of the 45 real estate transactions in question.

Instead of Zunica, the Government called Kim Arnold, a veteran employee at Northwest Indiana Title to testify. She explained the company's role in the transaction. Typically, a title company is a key middleman in a real estate transaction. It conducts a title search to ensure the home can be sold unencumbered. It then prepares all the paperwork for the closing. Finally, it facilitates the final closing process in which title passes to the buyer and it is the one who disburses the funds (from the bank) to the seller. In sum, it's the lender's representative at the closing.

As everyone who has ever bought a house knows, the signing of documents and various forms is the key part of a real estate transaction. It causes ownership of the home to pass from one person or entity to another in exchange for funds, primarily from the banks in the form of a mortgage. The significance of the HUD-1 (a key component of the closing) was explained above. But there are two additional forms at issue which were prepared by Zunica and signed by the Tartareanus during the closings. One was a document, the Acknowledgment Form, which stated that "no portion of the buyer's down payment has been paid by the seller and that the source of

the buyer's funds has come solely from their own funds." [Trial Ex. 119.] The language

on that form changed at one point and so for certain charged transactions it stated that

"no portion of the buyer's down payment has been paid by the seller *or any third party*

*has not paid any portion of the buyer's down payment* and that the source of the

buyer's funds has come solely from their own funds." [Trial Ex. 145 (emphasis added).]

In addition, both buyer and seller signed a separate standard real estate closing form

acknowledging that Northwest Indiana Title Services and Zunica were "NOT ACTING

AS MY AGENT, ATTORNEY, REPRESENATIVE, OR FIDUCIARY at this real estate

closing" and that it had not provided legal advice on the matter. [Trial Ex. 88.] A

representative of Red Brick, generally Daniela, signed both forms at every closing at

issue in this case.

    At the evidentiary hearing on their habeas petition, the Tartareanus' trial

counsel, Kevin Milner, testified that he sat in on pre-trial interview with Zunica. Zunica

had told the FBI he was unaware of what the Tartareanus and Red Brick were doing

and that he changed the Acknowledgement Form as a result of a transaction which did

not involve Red Brick. He said the same thing during this interview as well. Mr. Milner

testified that he came away from his interview of Zunica with the impression that

Zunica knew the Tartareanus were committing fraud. His impression was that Zunica

went along with it in order to make money as the title agent because he earned a fee on

every transaction. Counsel credibly testified that he thought if he called Zunica as a

witness at trial that it would have been a disaster for his clients and only hurt them. He

suspected he would either stick to the story that he was as much in the dark as the

lenders, shifting blame onto the Tartareanus or assert his right against self-incrimination, potentially incriminating the Tartareanus even more. While the Tartareanus agreed with that assessment and trial strategy at the time, they now argue that not calling Zunica was a blunder of constitutional proportions.

Hiding the source of down was not the only element of the scheme either. Red Brick would often seed the buyers' bank accounts by depositing money into the accounts prior to applying for the loans. This gave the illusion of greater financial resources on the part of the buyer for the loan application. Red Brick employees would open these bank accounts for the buyers/borrowers (sometimes without their knowledge) and generally control them. After all, Red Brick was putting the company's cash into strangers' bank accounts and the individuals had to have their names on the accounts in order to claim the funds belonged to them as part of the loan application. But the point was to give the impression to banks that these individuals were more creditworthy, with cash on hand that wasn't really theirs. The defendants prepared the loan applications which listed these bank accounts as being an asset of the buyer when they knew this money was in fact Red Brick's.

Red Brick also sometimes provided the buyers with additional cash after the transaction had closed. Not out of the goodness of its heart mind you, but in order to make sure that the buyers had enough money to make at least two months' worth of mortgage payments. This was important because if too many buyers defaulted on their mortgages within the first 60 days or two-month period, then Red Brick would potentially be blacklisted by mortgage lenders. Because without the banks' lending

money, there was no profit potential for Red Brick. The buyer/borrowers had access to credit but little cash by which to purchase homes so convincing banks to lend money was the whole ballgame. That many of the buyers defaulted after that window was of no real consequence to Red Brick (or to the banks for that matter) since most of the loans were quickly sold into the secondary market. And of course, these cash payments, like the seller-provided down payments and the seeding of the accounts, were not disclosed to the lenders despite the affirmative obligation to do so.

Even though Daniela was "only" a Red Brick employee and not an owner, her role in the scheme was integral to the operation. As the person running the office, she was the one signing checks, passing on fraudulent documents to lenders and the title agent, and depositing money. While Darnell Maymon was the Red Brick employee who generally prepared the actual loan applications on behalf of buyers, when loan officers at banks needed additional information about buyers, Daniela would provide that information. Additionally, after the loan was secured, Daniela was the point person who coordinated the closing with the title company. She thus was in control of the transaction while the final details were being ironed out. The title company communicated with Daniela to inform her about the specific amount buyers would need to bring to the closing for a down payment—again, money that Red Brick was concealing was in fact coming from it.

As noted above, Daniela also had a real estate license. She used that license to help make the venture more profitable. Real estate license holders have access to a database containing information about home sales in any given area. In the real estate

industry, this information greatly informs the appraisal price and thus sale price of homes. Daniela used this database to find comparable properties (i.e., homes of roughly the same size) to the ones Red Brick was selling in order to justify the price. This had the ability to snowball as well, because each sale they made was a new home they could use as a comparable, pushing sale prices higher. This increased Red Brick's profit because it meant banks were lending out a greater amount of money. At the evidentiary hearing, the Tartareanus' trial counsel testified that he only learned Daniela had a real estate license shortly before trial, but that fact heavily influenced his decision to advise Daniela not to testify. He thought it eviscerated her primary defense which was that she was a pawn, acting without criminal intent because she had no idea concealing such information during a transaction was improper or illegal.

The buyers/borrowers, many of whom bought multiple house from Red Brick as "investments," testified at trial. Each of them explained how they were recruited by Red Brick employees and how the transactions were structured. They all testified that they provided no money towards a down payment. Many also said they quickly defaulted on the mortgages because renters quickly moved out or never materialized, contrary to what Red Brick had said would be the case. Several of these buyers testified they depleted their savings in order to try to make their mortgage payments and others had to file for bankruptcy.

On October 23, 2014, after a four-day trial, the Tartareanus were found guilty by a jury of one count of conspiracy to commit wire fraud and 16 counts of wire fraud. [DE 132, 136.] Adrian was sentenced to 36 months in prison, and Daniela was sentenced to

21 months in prison. [DE 263, 266.] In addition, the Tartareanus as well as their co-defendant Minas Litos (who pleaded guilty and testified against the Tartareanus at trial), were jointly ordered to pay restitution in the amount of $893,015, to Bank of America. [DE 286.] All three defendants appealed their sentences and the Seventh Circuit reversed on the restitution order to Bank of America, finding it was not a proper "victim." *See United States v. Litos*, 847 F.3d 906 (7th Cir. 2017). That court then sent the case back to me to re-do the sentencing. On remand, the Tartareanus were given the same terms of imprisonment and ordered to pay a $30,000.00 fine, a $1,700.00 special assessment but no restitution. [DE 374.] The Seventh Circuit affirmed that sentence on a second appeal. *United States v. Tartareanu*, 884 F.3d 741 (7th Cir. 2018).

As part of my discretion in sentencing, and on account of the Tartareanus' minor children, I ordered their sentences to be staggered, so that both parents would not be simultaneously incarcerated. They have now both completed their terms of imprisonment.

The Tartareanus filed their habeas corpus petition pursuant 28 U.S.C. § 2255. [DE 420.] The petition is a behemoth, comprising 146 pages of facts and legal argument, supplemented with thousands of pages of exhibits spread over multiple volumes. There are dozens of distinct arguments made in the petition—all of which I have considered and addressed as systematically as possible. They likewise have sought additional discovery to help bolster the merits of their petition. [DE 436.] The Government responded to the petition and opposed the request for additional discovery. [DE 462.] Because of the disputed issues of fact, particularly those concerning the performance

and decisions made by the Tartareanus' trial counsel Kevin Milner, an evidentiary

hearing was held and Mr. Milner testified. [DE 475.]

### Discussion

Habeas corpus relief under 28 U.S.C. § 2255 is reserved for "extraordinary

situations." *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996). It's a very high

hurdle to clear. It is not an opportunity to relitigate the facts or present a different

defense theory of the case that could have been brought at the time and maybe better

persuaded a jury. *Id.* Instead, it is designed to rectify serious constitutional violations.

Here, the Tartareanus argue that their Sixth Amendment right to counsel was violated

because their lawyers at trial and on appeal were so inept that they were objectively

unreasonable in their performance and deprived them of a fair trial.

Successfully arguing ineffective assistance of counsel is a tall order in its own

right. There are two elements: "(1) whether counsel's performance 'fell below an

objective standard of reasonableness,' and (2) whether counsel's errors prejudiced the

defendant, requiring him to show a reasonable probability that, but for those errors, the

result of the proceeding would have been different." *Blackmon v. Williams*, 823 F.3d 1088,

1102–03 (7th Cir. 2016) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). "A

reasonable probability is 'a probability sufficient to undermine confidence in the

outcome.'" *Id.* at 1105. This is a fluid standard, and "[n]o particular set of detailed rules

for counsel's conduct can satisfactorily take account of the variety of circumstances

faced by defense counsel or the range of legitimate decisions regarding how best to

represent a criminal defendant." *Strickland* 466 U.S. at 688-89. "Any such set of rules

would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* The flexibility of this objective test is not intended to create greater space for courts to examine past events with 20/20 hindsight and declare unsuccessful advocacy to be unreasonable simply because it was unsuccessful.

It must be emphasized that a claim of ineffective assistance of counsel is no occasion for Monday morning quarterbacking. It is and must be an objective test. The Supreme Court has been clear that courts must be deferential and presume reasonable performance by defense counsel in most situations, explaining:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689–90 (internal citations and quotation marks omitted).

Stated differently, a defendant is not guaranteed a perfect attorney or trial free from errors. No attorney is perfect, and I would venture to guess that no trial is

-14-

completely free of error. It's a human endeavor. I must examine counsel's performance and while bearing in mind they are "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011). If they do that (and reasonably execute that strategy), then they were almost by definition not ineffective.

Concerning defense counsel's choices of which witnesses to call in a case, "[t]he Constitution does not oblige counsel to present each and every witness that is suggested to him." *United States v. Berg*, 714 F.3d 490, 499 (7th Cir. 2013) (quoting *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005)). "Rather, counsel need only investigate possible lines of defense and make an informed decision." *Id.* "If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic. Strategic decisions like these, so long as they are made after a thorough investigation of law and facts, are virtually unchallengeable." *Blackmon*, 823 F.3d at 1103 (citations and quotation marks omitted). Where an attorney reasonably concludes that a prospective witness would potentially do more harm than good, their decision not to call the witness is almost beyond reproach. *Id.* After all, it's almost never advisable for a defense lawyer to fire a blunderbuss merely to dent the curtain walls of the Government's case without ever breaching them. Instead lawyers must be strategic, picking and choosing the most vulnerable aspects of the Government's case to attack in the hopes those will resonate and lead a jury to conclude the defendant is not guilty beyond a reasonable doubt. That those strategy decisions did not result in an acquittal cannot mean they were *per se* unreasonable or even the wrong strategy. Petitioners must show something

more than an incorrect strategy call and even deviations "from best practices or most

common custom" is not enough. *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011)

(quoting *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011). They must show their

attorney's performance or decisions "amounted to incompetence under prevailing

professional norms." *Id.*

Then there is the second element, a showing of prejudice as a result of counsel's

ineffective assistance. "To demonstrate prejudice, [a defendant] must show that 'there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.' It is insufficient for [a defendant] to show

merely that 'the errors had some conceivable effect on the outcome of the proceeding.'"

*United States v. Pergler*, 233 F.3d 1005, 1011 (7th Cir. 2000) (quoting *Strickland*, 466 U.S. at

693-94). Thus, even if counsel made some big mistakes at trial, if their absence wouldn't

have likely changed the result, there's no constitutional injury.

The Tartareanus' petition advances an everything-but-the-kitchen-sink-

approach, arguing dozens of different points and claiming the attorney they hired was

incompetent at every stage of the trial. Through this claim of ineffective assistance of

counsel, petitioners seek to relitigate numerous factual issues which were presented at

trial. A primary focus is on a pretrial ruling I made based on the precedent of *United

States v. Phillips*, 731 F.3d 649 (7th Cir. 2013). That pretrial ruling related to evidence

sought by co-defendant Litos (before he agreed to plead guilty, flip, and testify against

the Tartareanus) about what information Bank of America considered in reviewing loan

applications. [DE 83 at 3.] The idea was that Litos believed the banks involved in this

case, and Bank of America in particular, did not care whatsoever what was in a loan

application when they were approving them. Afterall, they would usually be selling the

loans quickly anyway. According to Litos, this would go to the materiality of any false

statements on loan documents and to the issue as to whether he and his co-defendants

(the Tartareanus) had the necessary criminal intent. In my ruling, I discussed how

*Phillips* was in many ways distinguishable from the case before me (for example, the

crime at issue was making false statements to a bank which unlike wire fraud, has no

materiality element) but also how its holding could apply to the case before me in a

limited fashion. [DE 83 at 11-12.] I summed up my ruling as follows:

> If Litos wants to argue that another middleman or the banks' loan
> officers with whom he dealt told him something to encourage his
> false statements, or that he knew or believed something about the
> banks' loan policies, that renders him blameless for making false
> statements, under *Phillips* he will be welcome to make that
> argument. Such evidence would be relevant to whether the
> defendants acted with an intent to defraud. But the more sweeping
> request by the defendants for evidence that Bank of America would
> routinely not rely upon the pertinent information in making loans
> has no relevance to this case and is therefore not exculpatory.

[*Id.* at 12.] The latter part of the ruling was because "[t]here's no hint in *Phillips* that

anything the bank does can exculpate the defendants, just that [another's]

encouragement of and justification for the wrong might exculpate them." [*Id.* at 11.]

Much of the Tartareanus' petition misinterprets the scope of my pretrial ruling and

*Phillips* to suggest that their counsel was constitutionally ineffective for failing to put

Bank of America on trial.

      Another recurring theme in this opinion is that while the Tartareanus' trial

counsel did not call certain witnesses, introduce certain documents into evidence, or lodge certain objections, it wouldn't have mattered if he had. None of it was definitively exculpatory. Instead, the referenced evidence and assumed testimony almost always would have been a mixed bag or merely undermined one small aspect of the Government's case while leaving mountains of other evidence untouched. As a result, it is nearly impossible to say that the trial strategy of not introducing this evidence or calling these witnesses was objectively unreasonable. What's more, the mixed nature of the evidence, some of which borders on irrelevant red herrings, could very likely have hurt the Tartareanus more than it could have helped them. Thus, they cannot show prejudice from these trial strategy decisions either. This likewise dooms their arguments that their appellate counsel was infective for not arguing what they now argue. In any event, each of these arguments are discussed in detail below generally in the order they are raised in the petition.

### A. Trial Counsel's Performance Relating to Stephanie Riggs and Bank of America's Role in the Transactions

The Tartareanus' first argument is that their trial attorney was ineffective for failing to put forth a more thorough defense that Bank of America, the lender in the majority of the transactions at issue, knew that Red Brick was supplying the money for down payments. Likewise, they now wish to argue that if fraud was occurring, it was Bank of America's own employee, Stephanie Riggs, who was falsifying information about borrower income, not the Tartareanus.

The problem is no one really disputes that Bank of America had what could be

charitably called less-than-stellar due diligence practices. Or that it had financial incentive to approve loans because it intended to sell those same loans instead of keeping them on its books. But even accepting that as true, it does not exculpate the Tartareanus' fraudulent intent when they were making knowingly false statements to Bank of America (and others) about the source of down payments and other borrower information. In fact, there was ample evidence at trial that they were. What's more, it doesn't matter if Bank of America didn't solely rely on what Red Brick said or if it had other motivations for approving loans. "[T]here is no requirement that the statement must in fact influence the decisionmaker (that would be reliance)" and reliance is not an element of wire fraud. *United States v. Reynolds*, 189 F.3d 521, 525 (7th Cir. 1999). Whether "a particular lender or group of lenders was in fact reasonable is irrelevant" to the objective question of fraudulent intent. *United States v. Betts-Gaston*, 860 F.3d 525, 532-33 (7th Cir. 2017). The Tartareanus' are attempting to change fraudulent intent from an objective test to an analysis of the subjective state of mind of the recipient of fraudulent statements. But that's not the law. "[I]t is no defense that the intended victim of wire fraud was too trusting and gullible or, on the other hand, was too smart or sophisticated to be taken in by the deception." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). What matters is the defendants intended to lie and then did actually lie in a material way to make money.

As for Riggs, the Tartareanus' arguments are primarily speculative and only work if you ignore other evidence in this case. For example, they say Bank of America fired Riggs "for engaging in potentially fraudulent loan practices." [DE 420 at 74.] But

-19-

the evidence shows that while Bank of America did fire Riggs, it did so for "a loss of confidence" but only after it determined there was no "conclusive evidence that [she] has been involved in any dishonest act or falsification of bank records." [Trial Ex. 3.] But none of this does anything to diminish the Tartareanus' conduct. Next, they point to the fact that on cross-examination Litos testified that Daniela told him that Riggs told her it was OK for sellers to pay the down payment. But Litos also said he "didn't think that would have been the case." (10/21/14 Tr. 107-108.) In other words, he thought Daniela was lying. Riggs presumably would have said the same thing because that's what she told the FBI. She said it was never disclosed to her or Bank of America that Red Brick was secretly financing the borrowers' down payments. (DE 462 at Ex. G at 9-10.] Lastly, the Tartareanus point to a document from their files which stated that one borrower's monthly income was $2,400 while the final loan documents stated it was $3,400. (Ex. H at 2-4.) They say that this document shows Riggs was the one inflating income on loan applications not the Tartareanus and Red Brick. Again, this appears to be supposition. There's no evidence this was Riggs' handwriting or that this document was ever in possession of Bank of America. Furthermore, at the end of the day, it represents a single detail of only 1 of 45 transactions.

Even if what the Tartareanus now argue is true, it suggests that Riggs was committing fraud *in addition* to what the Tartareanus were doing or she was reckless in her job. But it doesn't absolve the Tartareanus of guilt. *See United States v. Winkle*, 477 F.3d 407, 414 n.3 (6th Cir. 2007) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank, and approval of a bank officer does not relieve a defendant of liability for

bank fraud."). Contrary to what the Tartareanus argue in their petition, it does not follow that "[s]ince this evidence was helpful to the defense … it is unreasonable for defense counsel not to introduce this evidence in support of this defense." [DE 420 at 73.] There's no obligation to make every single argument possible at trial. It was not unreasonable for trial counsel to not call Riggs because her testimony probably would have hurt the Tartareanus more than it helped or been a mixed bag. *Blackmon*, 823 F.3d at 1103. Finally, as to prejudice, it's worth reemphasizing that Bank of America was the lender on 32 of 45 transactions and Riggs had nothing to do with the remaining 13 and so the Tartareanus' arguments in no way exonerate them.

### B. Trial Counsel's Performance Relating to Rick Zunica's Role in the Transactions

The Tartareanus' next series of arguments focus on Rick Zunica who, like Riggs, was involved in nearly all of the transactions but was not called as a witness by either side. Recall, Zunica played a few different roles related to this case. His primary role was that of being the title agent for nearly all of the 45 charged transactions through his company Northwest Indiana Title. But additionally, in a different capacity he worked as Red Brick's attorney on various matters. The Tartareanus say that given what they say Zunica would have testified to, their attorney's decision not to call him to testify was constitutionally ineffective and prejudicial to their case. I disagree.

First, petitioners say that had Zunica been called to testify he would have testified that the "Acknowledgment Form" he had the seller sign was a "sham document" designed solely to protect himself and give him plausible deniability that he

knew fraud was going on. This was the document which stated that "the source of the buys' funds has come solely from their own funds" and that "no portion of the buyer's down payment has been paid by the seller." [Trial Ex. 119.] But this argument seems predicated only on speculation.

Indeed, there is evidence that Zunica would have testified to the contrary. In his interviews with the FBI and testimony before the grand jury, Zunica stated that down payment assistance from sellers must be disclosed on the HUD-1 and that he did not know the defendants were providing the down payments for the transactions. The Tartareanus would have me believe that Zunica would have waltzed into court and blithely admitted that what he told the grand jury was false (subjecting him to a perjury charge). That seems fanciful. The Tartareanus also offer their theory as to why Zunica changed the language of the Acknowledgment Form to include the additional "third party" language (they say he suspected them of fraud and Litos testified as much at trial). But Zunica told the FBI it was unrelated to Red Brick and because of another transaction. (Ex. D at 19.) Furthermore, the Tartareanus' trial counsel sat in on an interview with Zunica during his pretrial preparation and his conclusion was that while he didn't believe Zunica was blameless, he would be a terrible witness for his clients because he would presumably testify consistent with his statements to the FBI or potentially asserting his rights against self-incrimination. When an attorney investigates and interviews a witness and then makes a calculated decision not to call the witness, they're not being ineffective. That remains the case even if their client decides that decision was a mistake after being convicted.

-22-

The Tartareanus' argument that Zunica would have testified he didn't send any of the Acknowledgement Letters to the banks or lenders at issue is beside the point. It's irrelevant for purposes of wire fraud. Lying to Zunica in the Acknowledgment Form in an effort to further conceal the fraud would likely be sufficient on its own to convict. *See United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013) (holding that there is no "convergence" required between the party deceived and the party that is defrauded of money or property under the parallel mail fraud statute). It's thus difficult to see how Zunica could have helped the Tartareanus on this issue because in the end, the HUD-1 (which the lender unquestionably receives) did not disclose that the defendants were the source of the down payments. It's not as if the Acknowledgment Forms were the only false statement at issue in this case.

The Tartareanus' also point to the "Grant Affidavits" that Daniela says were in Red Brick's files and which disclosed the existence of the Coalition of Concern but which were never provided to the lender. This is a true red herring, as there was no obligation to turn those documents over to the lender. But there was an obligation to fill out the HUD-1 and tell the truth on that document. And Red Brick lied on the HUD-1 about the source of the down payment. Other arguments relating to what Zunica did or didn't do in specific transactions read as minor quibbles and "gotchas" against Zunica which hardly would have absolved the Tartareanus given the remaining evidence in this case. I've considered them all and found none to have merit.

Really, if what the Tartareanus now argue (mostly without proof) is true, it seems likely they were in cahoots with Zunica to obtain money from the banks under

false pretenses. That certainly seems as plausible, if not more plausible, than the Tartareanus being innocent. After all, their interests were aligned; both wanted to see the bogus closings go through. On the other hand, given Zunica's statements to the FBI, it seems even more likely that the Tartareanus were deceiving him as much as the banks. Either way, it's almost impossible to see how Zunica's supposed testimony on this point would have helped the Tartareanus. It seems likely that Zunica would have testified consistent with his statements to the FBI and in the process bury the Tartareanus. The only other possibility is that he would have asserted his Fifth Amendment right against self-incrimination. In sum, not calling Zunica to testify was not ineffective assistance of counsel.

Lastly, petitioners argue that Zunica should have been called to testify because he was their attorney. They say that would have allowed them to assert an advice-of-counsel defense. In their petition and at the evidentiary hearing, the Tartareanus introduced dockets from various pieces of litigation in which Zunica was listed as counsel of record for Red Brick. (Ex. GG.) That much seems true. However, there's no evidence that their attorney-client relationship covered anything besides those discrete litigation matters. And it would have been an obvious conflict of interest for him, as the title agent, to be representing either the buyer or the seller in the home sales. As title agent, he was the agent of the lender and obviously the Tartareanus knew that at the time. They explicitly signed documents at every single closing that stated Northwest Indiana Title (*i.e.*, Zunica) was not acting as their attorney or agent.

What's more, the Tartareanus simply assume that they would have been able to assert an advice of counsel defense and get a jury instruction on the issue solely based on them having some attorney-client relationship with Zunica. But that's not how the law works. The advice of counsel defense has five elements that must be met before it may be validly asserted. Those require a defendant to establish that:

> (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had been given a full report.

*United States v. Al-Shahin*, 474 F.3d 941, 947–48 (7th Cir. 2007) (quoting *United States v. Cheek,* 3 F.3d 1057, 1061 (7th Cir. 1993)). There's no evidence to support that the Tartareanus complied with all five of these elements. Thus, even assuming Zunica testified and testified he was their attorney at the closings (again, contrary to the specific form he had Red Brick sign at closing which stated the exact opposite), an advice of counsel defense does not follow from the barebones facts and arguments the Tartareanus now make.

## C.  Trial Counsel's Performance Relating to Post-Indictment Transactions

Another supposedly prejudicial error on their attorney's part was failing to bring in evidence of a single transaction otherwise unconnected to the 45 transactions charged. Post-indictment, Red Brick sold a house to a buyer, and as part of that process wrote the buyer a check for $6,750 prior to closing without disclosing it to the lender.

The Tartareanus say this shows they had no intent to defraud and somehow means none of their previous lies mattered.

I'm hard pressed to understand this argument. One of many problems with it is the simple fact it wasn't the same situation as the 45 properties charged in the indictment. The Tartareanus do not contest the Government's response that the $6,750 in question that was given to the buyer was not for a down payment. Instead, it was the return of a $6,000 security deposit the buyer had given Red Brick prior and $750 in *pro rata* rent from the property. Red Brick was giving the buyer back his own money, not providing him money in the first instance to buy the house. At best, trying to introduce this evidence would have been an irrelevant sideshow and their attorney was under no obligation to put forth such evidence in support of their case. It likely would have been excluded as irrelevant anyway. But even if it had some marginal probative value, the probative value would have been vastly outweighed by the needless consumption of time and confusion of issues to the jury. *See* Fed. R. Evid. 403. And in all events, it is no defense to a crime to point to other instances in which you obeyed the law. *See United States v. Leahy*, 464 F.3d 773, 798 (7th Cir. 2006) ("Just because [the defendant] did not continue with the fraud after the scheme had been discovered has no bearing on whether he participated before the fraud was out in the open."). However you frame it, the argument is meritless.

### D.  Trial Counsel's Performance Relating to Co-Defendant and Cooperating Witness Minas Litos

Unlike Riggs and Zunica, the Tartareanus' co-defendant Minas Litos testified at trial. Originally Litos pleaded not guilty alongside the Tartareanus. But shortly before the trial, he changed his mind, pleaded guilty to the charges against him and sought to cooperate with the Government. That cooperation included testifying against his former business partner and employee. The Tartareanus say that the approach their attorney took in cross-examining Litos on the stand was ineffective and prejudicial. I disagree.

Given the involvement in the crimes that Litos admitted to, it is not surprising that his testimony was a key part of the trial. Since he had admitted he was guilty and was now testifying about it, it made sense for the Tartareanus to try and say he was the only guilty one amongst them. That's exactly what their attorney tried to do on cross-examination. He hammered Litos on the fact he had maintained his innocence and only recently flipped in order to get favorable treatment from the Government. That's how flippers work in criminal cases, and sometimes it leads juries to doubt the truthfulness of the witness. It didn't work here, but that doesn't mean trial counsel was ineffective.

The Tartareanus further point to emails between Litos and his attorneys in which he stated reasons why he thought he and the Tartareanus weren't guilty. They complain that Litos was not confronted with these emails on cross-examination. But even if they were used, there's no reason to think a jury would think Litos was telling the truth (or that somehow he was the arbiter of what is or isn't illegal) in emails between his lawyers when he was defending against criminal charges. It is no stretch of the

imagination to think that if presented with those emails, Litos would have testified that

he said those things when he was trying to defend himself. Now that he was no longer

defending himself and had admitted his guilt, he no longer needed to lie. It's thus

difficult to see how that could have possibly helped the Tartareanus. As such, nothing

about their attorney's vigorous cross-examination of Litos rises to the level of ineffective

assistance of counsel.

### E.  Trial Counsel's Cross-Examination of Buyers and other Secondary Witnesses

The Tartareanus raise a host of minor points they say their counsel should have

made during the cross examinations of the buyers/borrowers and Red Brick Employees

who testified. Those witnesses were Julius Horton, Linda Miller, Zulay Alverez, Francis

Collins, Alberto Gonzalez, Melissa Hurtado, Francisco Rodriguez, Jonathan Sein,

Carolyn Brown Dudek, and Joseph Aguirre. The precise things the Tartareanus think

should have been raised vary from witness to witness. But in general, they say their

attorney should have vigorously cross examined all of these witnesses in an effort to

show the following things: (1) Red Brick helped them obtain renters more than what the

witnesses testified to; (2) it wasn't Red Brick's responsibility to do that; (3) the

witnesses' descriptions of the properties as rundown was contradicted by evidence like

receipts showing the Tartareanus spent money rehabbing the homes; and (4) there were

better looking photos of the homes their attorney could have used as opposed to what

the Government had admitted. Other points they say their lawyer was constitutionally

required to make borderline on the ridiculous. For example, they accuse one witness of

committing insurance fraud because of "a single sentence in a single letter written by an

insurance claims processor denying her claim for reimbursement because the 'actual date of loss was December 4, 2008,' and she was already reimbursed by another company." [DE 462 at 35 (discussing Ex. Y).] I won't go into each individual one here in granular detail, but all have been considered and rejected.

Instead of taking the scattershot and scorched earth approach the Tartareanus think was constitutionally mandated, their attorney did not cross examine many of the buyers/borrowers at all. This was presumably because the points to be made were a distraction from the main issues. Each of these individual buyers testified to how they felt they had been taken advantage of and had lost a lot of money. They were sympathetic witnesses, even if they probably shouldn't have been so easily fooled by the defendants into trying to get rich quick. That trial counsel did not try to eviscerate them on cross-examination over every small inconsistency is hardly ineffective assistance. "On the contrary, deciding not to cross-examine [a] sympathetic witness [is] well within the realm of sound trial strategy, and we will not, in hindsight, second-guess that decision." *Bergmann v. McCaughtry*, 65 F.3d 1372, 1379–80 (7th Cir. 1995); *see also United States v. Sheneman*, No. 3:10-CR-126 JD, 2015 WL 4139247, at *22 (N.D. Ind. July 8, 2015) (applying *Bergman* in the context of a § 2255 petition and finding no ineffective assistance of counsel for similar reasons). It is a common trial strategy, especially on matters which have nothing to do with the central issues in the case. In any event, it's almost impossible to fathom how the failure to cross-examine the witnesses on these ancillary points could have led to a different result. So there was no prejudice either.

**F.  Trial Counsel's Decision Not to Call Other Witnesses**

Petitioners' next argument is that their counsel was ineffective for failing to call a cadre of other witnesses who they say all would have supported their claims of innocence. Specifically, the Tartareanus say their attorney should have called Edmond Chisholm, Darryl McCullough, Carla Atunez, Brenda Pena, and Alice Baker to testify. [DE 420 at 131.] Attached to their petition are affidavits from each of these individuals who engaged in real estate transactions with the Tartareanus that did not involve Litos. None of these transactions were the transactions at issue in this case or charged in the indictment. But the theory is that the fraud at issue in this case was the sole fault of Litos, the Tartareanus had no idea what was going on, and these witnesses prove that.

The problem with this argument, as the Tartareanus acknowledge, is that "[e]vidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment." *United States v. Reece*, 666 F.3d 1007, 1020 (7th Cir. 2012). Thus, despite their attempt to spin this proffered evidence as not falling within that category, that is exactly what the Tartareanus are saying should have been done. *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) ("[E]vidence that [defendant] engaged in certain legal [transactions] is generally irrelevant to the issue of whether [they] knew of other illegal [transactions]."). This seems like evidence which would have been rightly objected to and excluded at trial. A defendant isn't innocent of shoplifting from a 7-Eleven simply because they bought a Slurpee and a pack of cigarettes from the same store the day before. Similarly, the Tartareanus criminal intent as to the charged transactions is not at

all obviated by the fact there were other witnesses who may have testified that in other

transactions the Tartareanus did not commit fraud.

### G. Trial Counsel's Alleged Conflicts of Interest

On top of being allegedly incompetent, the Tartareanus say their attorney had

undisclosed conflicts of interest which further deprived them of a fair trial. Even a

cursory review of these allegations shows them to be unfounded. To succeed on a

conflict of interest claim, the Tartareanus most prove that their "defense attorney [was]

required to make a choice advancing his owner interest to the detriment of his client's

interest." *Gray-Bey v. United States*, 156 F.3d 733, 738 (7th Cir. 1998). There are other

considerations which come into play depending on the exact circumstances, but in any

event, the Tartareanus' arguments fall short of this basic standard because there is no

actual evidence of any real conflict.

First, they say their attorney was conflicted because of his prior "personal and/or

business relationship with Rick Zunica." [DE 420 at 127.] This argument is scurrilous.

As seen, Zunica was a key witness and heavily involved in the transactions at issue in

this case. So if there was an undisclosed or unknown relationship between the

Tartareanus' attorney and Zunica, this argument could have salience. But the sole basis

for the supposed conflict, however, is that after trial, the Tartareanus learned that

Zunica and Northwest Indiana Title were the title company that handled Mr. Milner's

purchase of a vacation home *in the year 2000*. That's more than a decade before the trial

in this case. That's it. The Tartareanus spend several pages of their petition speculating

that no one knows the nature of this relationship, what it could have encompassed and

that maybe this was the reason Zunica wasn't called at trial. They even suggest, without any evidence whatsoever, that their attorney represented Zunica during Zunica's grand jury testimony. But there is zero evidence their attorney ever represented Zunica or even knew him besides this apparently coincidental one-off and arms-length closing of a home some 14 years before trial.

At the evidentiary hearing, Mr. Milner confirmed that he had no idea who Zunica was prior to representing the Tartareanus. He said he had no recollection of Zunica being his title agent for his home purchase 20 years prior. This testimony is entirely believable and credible. In fact, why anyone would remember the name of the title agent their bank used when they bought a vacation house more than a decade prior is beyond me. But that is beside the point; even if their lawyer had remembered that Zunica had worked for the lender as the title agent for a home he purchased, there's simply no basis to suggest there was any conflict of interest. Their relationship was not an attorney-client relationship or fiduciary in nature. As the facts of this case show, there's no duty of trust or confidence between a buyer or seller in a real estate transaction and the title agent.

Second, the Tartareanus say that their attorney's prior representation of Paul Noerenberg, an individual who they say scammed them out of $100,000 in connection with Red Brick, created a conflict of interest. Noerenberg was a business associate of Litos and the Tartareanus who appears to have invested in Red Brick or provided it with a loan prior to the indictment in this case. Adrian eventually paid that loan/investment back, but now says, under somewhat unclear circumstances, that it

was extortion or a scam on Noerenberg's part. But that's the argument. The connection

between Noerenberg and the Tartareanus' attorney is somewhat more concrete than the

allegations relating to Zunica, but not by much. During the investigation in this case,

Noerenberg was interviewed by the FBI. During that interview, in which he was

represented by a different attorney, he made reference to the fact that he was at some

point in the past represented by Kevin Milner, who then became the Tartareanus' trial

counsel. But there's no indication of concurrent representation or any prejudicial

successive representation. At the evidentiary hearing, Milner testified that he

represented Noerenberg on a referral from another criminal defense lawyer in

Northwest Indiana. But Milner was not Noerenberg's attorney when he sat for a proffer

with the Government, which is about his only connection to this case. Daniela further

says that she knew about this representation prior to trial when she read the FBI

interview report where Noerenberg referenced his prior attorney. She just says she

didn't ascribe any significance to it at the time.

There's a good reason why Daniela didn't put much weight on Milner's earlier

representation of Noerenberg. It's because there appears to have been no substantive

connection between his earlier representation and the specific facts of this case. He was

not involved in any of the 45 transactions charged in the indictment. Thus, his FBI

interview wouldn't have been key. All the Tartareanus offer is that they think it would

have benefitted them at trial to have had Noerenberg to testify about how Litos was a

crook. But there was more than enough evidence at trial, including Litos' own

admissions, that he was a crook. So Noerenberg wouldn't have added anything. As

such, even if there was a conflict (which I'm dubious of), there's no real suggestion as to why it had any impact in the case or how the Tartareanus were prejudiced as a result.

## H.  The Jury Instruction Concerning Intent and Deliberate Indifference

The petitioners were convicted of 16 counts of wire fraud and conspiracy to commit wire fraud. In order to do that, the Government had the burden to show that Daniela and Adrian acted with the requisite *mens rea* or specific criminal intent. In wire fraud cases "intent to defraud requires a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Sheneman*, 682 F.3d 623, 629 (7th Cir. 2012) (quoting *United States v. Howard,* 619 F.3d 723, 727 (7th Cir. 2010)). But a person can also be found guilty in certain circumstances if they intentionally avoid learning the truth. This is called a deliberate indifference. When explained to a jury, we call it an ostrich instruction—the idea being that a person cannot stick their head in the sand and pretend they're oblivious to fraud going on all around them and in which they are participating. The Government argued that was the case here and I instructed the jury on this point without objection from the Tartareanus' counsel. They now say that failure to object violated their constitutional rights.

"A district court may give an ostrich instruction "where (1) a defendant claims to lack guilty knowledge, *i.e.,* knowledge of her conduct's illegality, and (2) the government presents evidence from which a jury could conclude that the defendant deliberately avoided the truth." *United States v. Green*, 648 F.3d 569, 582 (7th Cir. 2011) (quoting *United States v. Garcia,* 580 F.3d 528, 537 (7th Cir. 2009)). "The purpose of an

ostrich instruction is to inform the jury 'that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings.'" *Id.* (quoting *United States v. Carani,* 492 F.3d 867, 873 (7th Cir. 2007)). It is a commonly given jury instruction "in cases in which there is evidence that the defendant, knowingly or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings." *United States v. Wallace,* 212 F.3d 1000, 1004 (7th Cir. 2000) (citation and internal quotation omitted). The Seventh Circuit has approved of its use in wire fraud cases where a defendant is a real estate broker and "a reasonable broker would have seen the red flags in the transactions … and inquired further." *United States v. Ramirez,* 574 F.3d 869, 882 (7th Cir. 2009).

The Tartareanus say that wasn't their case. Instead, they say the evidence came down to a "binary choice" between "actual knowledge" and "complete innocence." [DE 420 at 135.] There was of course evidence that the Tartareanus knew exactly what was going on and were acting with specific criminal intent to make money through fraudulent means. That much we can agree upon. But at the same time, the Government strongly advanced a deliberate indifference theory and there was evidence to support it. For example, Daniela had a real estate license but claims she had no idea there was anything wrong with the seller secretly putting up the down payment for a house. She also claims in her affidavit that she didn't read "any of the documents" she signed even under oath or question the checks she wrote out. Likewise, both at trial and now in their

petition, the Tartareanus point the finger at nearly everyone else who worked at Red Brick, including Carolos Rodrigues, Daniel Maymon, and Minas Litos. Implicitly then, they all but acknowledge fraud was occurring but that they were assisting in it unknowingly. That argument is the exact reason we have the ostrich instruction. Given the extensive evidence which supported the instruction, it was not error for their counsel to have not objected. Any objection would have been overruled. And because an objection would have been futile, it wasn't a prejudicial error for their appellate counsel not to raise it on appeal either under the plain error standard.

### I.  Trial Counsel's Failure to Object to Testimony and Closing Argument

In addition to their arguments concerning their attorney's cross examination of Litos and the bevy of buyer/borrower witnesses, the Tartareanus say their attorney improperly failed to object to certain lines of testimony from certain witnesses and certain statements by the Government during closing arguments. None of these arguments have merit. It's far from certain that the objections they say should have been lodged were meritorious (and thus it wasn't ineffective for their attorney not to make them). Even if it was, none of the testimony that was allegedly admitted in error was so central to this case, either on its own or cumulatively, that it would have been reasonably likely to change the result (and thus there was no prejudice).

Before getting into the specific arguments, it's important to note that when reviewing a trial attorney's decision to object or not to object at trial, my review must be extremely deferential. The decision whether to object at trial is often a quintessential strategic decision and thus almost never ineffective assistance of counsel. The Seventh

Circuit has held, in multiple instances, that the decision not to object, even where the evidence at issue was likely inadmissible, is strategic and thus not ineffective. *See, e.g.*, *Bryant v. Brown*, 873 F.3d 988, 997 (7th Cir. 2017) ("Errors resulting from strategic miscalculations may fall within the wide range of competent representation."). That's in large part because "[a] competent trial strategy frequently is to mitigate damaging evidence by allowing it to come in without drawing additional attention to it, such as an objection would." *Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003) (citation omitted). Again, just because a strategy doesn't succeed, doesn't mean it was ineffective. With that in mind, I'll review the specific things the Tartareanus say it was ineffective assistance of counsel not to object to.

First, they say that when Francis Collins (a buyer/borrower) testified that Red Brick employee Joseph Aguirre (who worked to recruit victims) told him he wanted to introduce him to the people "really running the show" and that that referred to Litos and Adrian, it was improper hearsay. [DE 420 at 138.] This isn't hearsay, however, as it wasn't offered for the truth of the matter asserted. It was Collins explaining the impression of who he was being taken by Aguirre to go meet before becoming an investor. Furthermore, Collins testified this meant "mostly Minas [Litos]." Collins' testimony was thus not really prejudicial and even was in line with the Tartareanus' main defense that Litos was running the show and they were hapless pawns in his scheme.

Second, they say when Carolyn Brown Dudek (a Red Brick employee) testified that buyer/borrowers complained to her that the homes sold were not worth what they

had paid for it was "hearsay, also without foundational support." [DE 420 at 138.] Even if this testimony was hearsay and did not identify the speaker, it was harmless. There was ample evidence, such as photographs of the homes and the fact each of them sold for the appraisal price, as to the home's value. So, Dudek's testimony was hardly the lynchpin. Furthermore, while inflating the cost of the homes obviously increased Red Brick's profits, it was obviously not the only fraud at issue. There's thus no reason to think this testimony made much of a difference one way or another.

Third, they say when Joseph Aguirre (again, a Red Brick employee) testified about Red Brick failing to get almost all the homes it refurbished and sold qualified for Section 8 vouchers because they were not up to HUD's standards it was inadmissible hearsay. Again, I don't really see this as a hearsay issue, as Aguirre wasn't trying to introduce specifics about the standards associated with Section 8 housing. But more importantly, this was a minute point. Furthermore, on cross, the Tartareanus' attorney got Aguirre to admit that Section 8 homes have very exacting standards—they're not the same as habitability. So, it is again almost impossible to see where the prejudice was, as the point they're trying to make was made by their attorney.

Fourth, they say Sarah Harris (who helped funnel money for the down payment fraud) was allowed to testify without objection that someone at Red Brick told her "they didn't want to see the Coalition of Concern on the HUD again," causing her to start using her father's church, Love Feast Church to funnel down payments. [DE 420 at 139.] But as the Government notes, Harris quickly made clear who was directing her to do this when she received money from Litos to move around the count. Thus, even if it

was (a relatively minor) error for counsel not to object, the substance of the objection was quickly revealed and any prejudice rectified.

Fifth, they say that Francisco Rodriguez (another buyer/borrower) testified without objection that someone at Red Brick told him to open a bank account and defense counsel did not probe who gave this instruction. Petitioners say this was improper hearsay testimony. But once again, I don't see this as hearsay. The point of the testimony was that it caused Rodriguez to open a bank account and it was on the instructions of someone at Red Brick. And while counsel could have perhaps prodded the witness more about who made the statement and whether it was petitioners, it was not an error of constitutional proportions not to do so. "The mere fact that a lawyer makes errors in the course of a trial does not necessarily demonstrate" ineffective assistance. *U.S. ex rel. Huckstead v. Greer*, 737 F.2d 673, 676 (7th Cir. 1984).

Sixth, they say defense counsel again let in hearsay through the testimony of Zulay Alvarez, another buyer/borrower. At one point, she testified about how her and her husband had difficulty keeping renters or collecting rent. As a result, they eventually declared bankruptcy. The allegedly improper testimony was the fact that Alvarez did not specifically identify at times who it was at Red Brick who had told her about the renters. But that's only true if you look at her testimony in complete isolation. Alvarez testified that Carlos Rodriguez (a Red Brick employee) was the one who told her about how the rents would pay the mortgages. Just because Alvarez did not specifically mention him by name in her later testimony does not mean that it was an error on counsel's part to not object. Had counsel objected, the Government could have

asked a simple follow up question about who at Red Brick made promises to her about rental income and she would have identified Rodriguez as she had done earlier. The idea that this single bit of testimony was the only thread by which the Tartareanus were convicted is simply unbelievable. There was no error or prejudice.

Concerning closing arguments, the Tartareanus' arguments fail for similar reasons. They argue their trial counsel's failure to object to certain statements by the Government constituted ineffective assistance of counsel. To succeed, they must show "not only that the remarks denied [them] a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." *United States v. Bowman*, 535 F.3d 546, 550 (7th Cir. 2003). To determine whether the statements were in fact improper, I examine them first in isolation and then "in the context of the entire record." *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003). As for prejudice, there are five factors: "1) the nature and seriousness of the misconduct; 2) the extent to which the comments were invited by the defense; 3) the extent to which the prejudice was ameliorated by the court's instruction to the jury; 4) the defense's opportunity to counter any prejudice; and 5) the weight of the evidence supporting the conviction." *United States v. Common*, 818 F.3d 323, 333 (7th Cir. 2016) (quoting *Sandoval*, 347 F.3d at 631). Given these high standards, "improper comments during closing arguments rarely rise to the level of reversible error...." *United States v. Amerson*, 185 F.3d 676, 685 (7th Cir. 1999) (citation and internal quotation marks omitted).

The first statement relates to a video of Daniela's interview with the FBI in which she said she was innocent. This video was referenced by defense counsel during

opening statements, but no one used it at trial. Then, during closing, the Government referenced it and said it wouldn't have helped the Tartareanus. They now say this amounted to the Government improperly calling Daniela a liar and referencing facts not in evidence. Even if I agreed that the Government improperly insinuated that Daniela lied to the FBI during her interview, the remaining factors weigh against the Tartareanus. For one, the comment was clearly tied to the statement by defense counsel in the opening in which he referenced the video and what occurred on it, saying he "hoped" the Government would play it. Likewise, as is my custom in trials, I instructed the jury that "lawyers' statements and arguments are not evidence" and so this rather isolated comment is unlikely to have had much effect. Admittedly, defense counsel's ability to counter this was somewhat hampered by the fact there was no way for him to introduce his own client's statements to the FBI into evidence. Even as a mixed bag, it's difficult to see prejudice. There was overwhelming documentary evidence showing the financial paper trail and efforts the defendants took to conceal that they were hiding the source of down payments and likewise luring buyer/borrowers into their scheme.

Next, the Tartareanus say the Government improperly vouched for evidence when the prosecutor said "I don't buy it for a second" about the defense's theory that Litos forced them to use their personal bank accounts to further what they say was only his scheme. They home in on the fact the first person was used by the Government's attorney. But while the Government must not vouch for evidence, it is allowed to make "legitimate comment[s], based on the trial evidence and reason inferences there from." *United States v. Della Rose*, 403 F.3d 891, 906 (7th Cir. 2005). That includes errant use of

the first person too. *Id.*; *United States v. Patterson*, 23 F.3d 1239, 1250-51 (7th Cir. 1994) (use of first person in closing argument held not to be error). And in the end, it didn't concern any specific evidence, but instead related more broadly to the defense's theory of the case, which belies any real harm.

Next, the Tartareanus say the Government misstated evidence concerning the value of the homes at issue in the case. I disagree. Almost all of the buyer/borrowers testified the homes weren't worth what they bought them for. Red Brick employees, including Litos, also testified as much. In the end, real estate values are constantly in flux and rely heavily on subjective aspects, so this testimony was valid evidence. There's no magical perfect price for any piece of a real estate. The Tartareanus may feel this wasn't the best evidence, but it is still evidence, and the jury was entitled to give it the weight it wanted. The same goes for the argument relating to using appraisals to lift subsequent sales. Litos testified to this so the Government was allowed to reference it.

Lastly, the Tartareanus say the Government disparaged their counsel during closing arguments because the Government said their defense was nothing more than red herrings and analogized it to a squid or octopus shooting ink as a defense mechanism to obscure the truth. This argument strains credulity. This was a hard-fought trial where both sides on occasion used rhetorical flourishes in trying to make their points. I see this as nothing more than a creative way to comment on the defense's theory of the case. And while no one wants to be compared to a cephalopod, it is hardly "reprehensible" conduct as the Tartareanus say. Even the case law they cite on this point agrees it was not plain error for the Government to have used a similar analogy in

-42-

another case. *United States v. Matthews*, 240 F.3d 806, 819 (9th Cir. 2000) ("Examining a case in which the prosecutor used words such as 'stupid' and 'trash,' this court held that '[a] lawyer is entitled to characterize an argument with an epithet as well as a rebuttal.'" (quoting *Williams v. Borg,* 139 F.3d 737, 744–45 (9th Cir. 1998). There was thus no error in choosing not to object. And finally, like with other arguments, because they are without substantive merit, it was not ineffective assistance of appellate counsel to have not raised these issues on appeal.

**J.  Daniela's Waiver of Her Right to Testify at Trial**

Just as no defendant can be compelled to testify against themselves if they don't want to, all defendants have a constitutional right to testify on their own behalf if they so choose. *Starkweather v. Smith*, 574 F.3d 339, 403 (7th Cir. 2010). But like most rights, it can be waived, so long as the waiver is made knowingly, voluntarily, and intelligently. *Id.* Here, it is undisputed that during her trial, Daniela waived her right to testify and answered that she was doing so knowingly and voluntarily and that no one was coercing her. Nonetheless, she now says her decision not to testify wasn't voluntary for two reasons.

First, she says her lawyer told her that "she would immediately be taken into custody" if she testified. She supports this argument with her own affidavit where she says this conversation happened. At the evidentiary hearing, Daniela's trial counsel testified that he did not say this to her. While he could not remember any particular conversation, as it has been more than five years, he recalled telling her that if she did

-43-

testify and was found guilty, it could cause her sentence to be longer if I found she had lied on the stand (an obstruction of justice sentencing enhancement).

Given trial counsel's very credible testimony, the fact I personal examined Daniela under oath about her waiver, and the fact Daniela supports her version of events only with her own affidavit, I find this argument has no merit. If there were any merit, it would completely undermine the finality of any criminal trial where a defendant waives their right to testify in their own defense. A criminal defendant could get a second trial as a matter of right simply by claiming, without any extrinsic evidence, that their waiver was coerced. That cannot be the case. *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir. 1991) ("It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, 'My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial.'"); *Miranda v. Chandler*, 405 F. App'x 52, 53–54 (7th Cir. 2010) ("Defendants who waive their right to testify and later claim coercion must provide some form of substantiation, such as an affidavit from their lawyer in order to support their claim.").

Second, Daniela says that her decision not to testify was not made knowingly because of all of the aforementioned errors on her attorney's part. But as discussed throughout this opinion, I find none of her attorney's errors to have been blunders of constitutional proportions. Thus, I reject her rather circular argument. Of course her attorney could have done things differently and different tactics may have worked better with this particular jury. We'll never know. As stated at the outset, there are

"countless ways to provide effective assistance in any given case" and that was done here. *See Harrington*, 562 U.S. at 106. Counsel's performance did not override Daniela's free will and decision not to testify.

### K.  Any Cumulative Prejudice from the Alleged Errors

I've walked through each of the arguments in the Tartareanus' petition individually. But that is not to say I examined them only in isolation. A reviewing court commits error and misapplies *Strickland* where it examines each of counsel's alleged deficiencies only in isolation and thereby misses the forest for the trees. *See Harris v. Thompson*, 698 F.3d 609, 648 (7th Cir. 2012) ("The question is whether counsel's entire performance at the hearing prejudiced Harris. By analyzing each deficiency in isolation, the appellate court clearly misapplied the *Strickland* prejudice prong."). The Seventh Circuit recently reminded district courts that there is a mandate to conduct "a cumulative assessment of prejudice" above and beyond finding that each individual asserted error fails to meet both of *Strickland*'s prongs. *Myers v. Neal*, 970 F.3d 780 (7th Cir. 2020) (reversing district court's grant of federal habeas corpus petition). Even though I have concluded that none of the asserted errors were ineffective assistance on their own, I must still determine whether the whole is greater than the sum of its parts.

I think the answer is a definitive "no." Here, even in the instances where there was *maybe* an error on counsel's part beyond an ultimately unsuccessful strategy, there is simply no way to show prejudice given the amount of evidence which supported the Tartareanus' guilt. A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record

support." *Strickland*, 446 U.S. at 696; *Harris*, 698 F.3d at 645 (same). This case is in the latter category, and the evidence of guilt was overwhelming. I said as much at sentencing and I reiterate it here. The paper trail showing money moving from Red Brick to the buyers was clear, despite the equally clear steps taken to try and conceal the source from the banks. And despite numerous instances and places where this could (and should) have been disclosed, the defendants obfuscated the facts. Every single buyer testified that they put no money down on these homes but in every single transaction Red Brick made it seem like the buyers were using their own money. That's a strong case of guilt in a case like this. *See Sheneman*, 2015 WL 4139247, at *28 ("Perhaps most damning was the evidence that Mr. Sheneman paid every dollar of the down payments for the sixty properties at issue, without disclosure to the lenders.") (denying habeas relief for wire fraud convictions in case involving home flipping and misleading banks about the source of down payments).

## L.  Petitioners' Request for Additional Discovery and Evidentiary Hearing

To help bolster their habeas corpus petition, the Tartareanus sought an evidentiary hearing and specific categories of discovery (both documents and depositions) which they contend will help prove their innocence. [DE 436.] I granted the request for an evidentiary hearing in this case and allowed the Tartareanus' new counsel to question their trial counsel under oath. I allowed this because it seemed the most efficient way to probe the issues relating to the adequacy of representation, Daniela's sworn statement that her attorney told her she would be taken into custody immediately if she testified, and the alleged conflicts of interest. But as demonstrated in

this opinion, the testimony from the evidentiary hearing generally cut against the Tartareanus at every turn. Given this and my review of the trial transcript and petition, I see no basis to allow discovery or a supplemental evidentiary hearing.

Allowing discovery in a habeas corpus proceeding is something that is within my discretion. There is no discovery as a matter of right. In order to obtain additional discovery in a habeas proceeding, a petitioner must (1) make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation; and (2) show "good cause" for the discovery." *Henderson v. Walls*, 296 F.3d 541, 553 (7th Cir. 2002). As discussed throughout this opinion, I don't think there are any colorable claims of constitutional violations, especially considering Mr. Milner's testimony at the evidentiary hearing. Thus, there's no basis to allow for discovery. And even for the borderline arguments that are almost colorable, I do not think good cause has been shown because there's no reason to think that any helpful facts will come about from additional discovery. Each specific category and request are discussed below.

First, the Tartareanus seek additional information concerning their attorney's relationship with Zunica and Noerenberg. [DE 436 at ¶5(c).] But they were given wide berth at the hearing to question Milner at length on those subjects. And as discussed above, the idea of a conflict of interest in this case seems completely speculative especially in light of Milner's reasonable testimony to the contrary at the hearing. "Mere unsupported allegations cannot sustain a petitioner's request for a hearing." *Aleman v. United States,* 878 F.2d 1009, 1012 (7th Cir.1989) (citing *United States ex rel. Edwards v. Warden,* 676 F.2d 254, 256 n. 3 (7th Cir. 1982). And I think that same logic applies to a

request to depose Zunica or Noerenberg as well. The defendants were given a full

opportunity to grill Milner on these supposed conflicts. Nothing came of it. To allow

any further discovery on this topic would be expensive, disruptive, and seems almost

guaranteed to result in nothing.

Second, the Tartareanus seek additional documents which would tend to show

what information Bank of America was in possession of during the period in question.

[DE 436 at ¶5(d).] In connection with its investigation, the Government subpoenaed

Bank of America for records and the Government provided the Tartareanus with more

than 21,000 pages of materials the bank produced. The subpoena was broadly worded

and would have encompassed the materials the Tartareanus now seek. Thus, it's fair to

assume they don't exist or were not in Bank of America's possession. At the hearing, the

Tartareanus' attorney argued Bank of America probably didn't fully comply with the

subpoena. But there's zero evidence of that and I will not re-open this case and

authorize a fishing expedition under the Federal Rules of Civil Procedure simply on

counsel's unfounded whims about subpoena compliance.

Third, they seek all notes taken by their attorney concerning Rick Zunica. But at

the evidentiary hearing, the Tartareanus' trial counsel testified that he did not take

notes at the meeting in which he sat in on an interview with Litos's counsel and Zunica.

I have no reason to believe he was lying under oath when he said that and thus any

discovery, even if relevant, would be futile. The notes don't and never existed.

Finally, they seek depositions of Stephanie Riggs and Zunica (again). The

Tartareanus would like to depose these two because they still suspect they knew what

was going on regarding the down payments that Red Brick was providing. They also sought to depose their former attorney, but that request has presumably been obviated by the evidentiary hearing in which their trial counsel was questioned for several hours. Concerning the other two, there is ample evidence about Riggs and Zunica which was turned over in which they indicated they were not aware who was providing the money for the down payments. Beyond the Tartareanus' contentions that Riggs and Zunica were lying and knew more than they let on, there's no reason to think they would testify any differently than the statements already made. Thus, there is no good cause to allow either of those individuals to be deposed.

### Conclusion

For the foregoing reasons, the petition to vacate the convictions and sentences of Adrian Tartareanu and Daniella Tartareanu pursuant to 28 U.S.C. § 2255 [DE 420] is DENIED. Furthermore, because the petition is without merit, the petitioners' request for discovery and an additional evidentiary hearing [DE 436] is likewise DENIED.

SO ORDERED on September 17, 2020.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT